IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA

GARY DUBOSE TERRY, 5054          )
                    Petitioner,  )     C/A No. 4:12-01798-RMG-TER
                                 )
                                 )
        v.                       )
                                 )
WILLIAM R. BYARS, JR., Commissioner,  )
South Carolina Department of Corrections;  )
Wayne C. McCabe, Warden of Lieber  )
Correctional Institution,        )
                    Respondents.  )
_____)

## PETITIONER'S AMENDED RESPONSE TO RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE EXHIBITS

Petitioner, Gary Dubose Terry, hereby responds to Respondent's Amended Motion for Summary Judgment and Memorandum in Support of Summary Judgment, and Motion to Strike Exhibits filed by Respondent on October 24, 2018. Docket Nos. 129-131. For the reasons provided below, Petitioner submits summary judgment is not appropriate in this case because there are numerous issues of material fact that must be resolved. Also, Respondent's Motion to Strike Exhibits, Docket No. 131, should be denied because they are properly considered by this Court in resolving Petitioner's claims.

## INTRODUCTION

Respectfully, this Court should grant habeas relief with respect to Petitioner's Ground I. Regarding the other claims raised, this Court should grant an evidentiary hearing to consider Petitioner's claim of cause to excuse the procedural default of not having previously raised these claims in state court.

With respect to Ground I of the habeas petition, the South Carolina Supreme Court's decision was contrary to and involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.   28 U. S. C. § 2254(d) (1). Additionally, the state court unreasonably determined the facts based on the record before it.  28 U.S.C. §2254(d)(2). Granting Respondent's motion for summary judgment is improper because Petitioner is entitled to relief.  With respect to Grounds II-V, this Court must address the merits of the claims because there is cause to excuse the procedural default under the United States Supreme Court opinion in *Martinez v. Ryan*, 566 U.S.1 (2012).  Also, this Court should deny Respondent's Motion to Strike Exhibits from Terry's habeas petition as they are essential to this Court's consideration of Petitioner's claims.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold, Inc.,* 369 U.S. 654 (1962).  Respondent shoulders the initial burden of demonstrating to

this Court there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).

## ARGUMENTS

I.    **In violation of the Sixth and Fourteenth Amendments to the United States Constitution, Terry was denied the effective assistance of trial counsel due to (1) Trial counsel's failure to object on the basis of prosecutorial misconduct to exclusion of his inculpatory statement to police from the trial evidence; and (2) trial counsel's failure to concede guilt during the trial, after counsel had already informed the jury of his confession in opening statements, in order to maintain credibility with the jury in the inevitable capital sentencing hearing.**

Terry recounts the factual basis for this claim in his habeas petition. Ground I, Docket No.

16. In short, counsel's conduct was deficient and prejudicial in failing to object, on the basis of

state misconduct, to the exclusion of Terry's inculpatory statement from the trial evidence. This

error was compounded by counsel's deficient and prejudicial conduct in failing to concede guilt

during the trial, after counsel had already informed the jury of Terry's confession in opening

statements, in order to maintain credibility with the jury in the inevitable capital sentencing

hearing. Counsel's conduct fell below the standards of effective assistance of counsel, and Terry

was prejudiced by their substandard performance. *Strickland v. Washington*, 466 U.S. 668 (1984);

*Florida v. Nixon*, 543 U.S. 175, 190-91 (2004).

With respect to the first issue, relying on the United States Supreme Court's opinion in

*Old Chief v. United States*, 519 U.S. 172 (1997), the South Carolina Supreme Court held that the

prosecution had engaged only in appropriate "trial strategy," *i.e.*, "the State used the wide

discretion it is afforded in the selection and presentation of evidence." *Terry v. State,* 714 S.E.2d

326, 329 (S.C. 2011). Because the court found no "prosecutorial misconduct," counsel was not

ineffective for failing to object on this basis. On this point, the South Carolina Supreme Court's

decision involves an unreasonable application of federal law, and this Court should grant petitioner relief.

With respect to the second issue, the lower court assumed that counsel's conduct was deficient, after informing the jury in opening that Terry confessed to these crimes and another murder, "in not changing their strategy to gain credibility with the jury." *Id.* at 68, 329. The court found no prejudice, however, because of the strength of "the evidence the State presented during the guilt phase of trial" to establish Terry's guilt. *Id.* Again, the South Carolina Supreme Court's decision, on this point, is an unreasonable application of established Federal law and an unreasonable determination of facts based on the record in this case.

In disposing of a §2254 habeas corpus petition federal courts are substantially constrained in their review of state court convictions by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA was "designed to further the principles of comity, finality, and federalism" by limiting federal habeas proceedings. *Sharpe v. Bell*, 593 F.3d 372, 379 (4th Cir.2010). Accordingly, if a state court adjudicates a petitioner's claim on the merits, a federal court may only award habeas relief if the resulting state decision "[i]s contrary to or involved an unreasonable application of federal law" or "[i]s based on an unreasonable determination of the facts in light of the evidence" that was before it. 28 U.S.C. §2254(d). "A state court's decision is 'contrary to' clearly established federal law only if it is 'substantially different' from the relevant Supreme Court precedent; it is 'an unreasonable application of' clearly established federal law only if it is 'objectively unreasonable.'" *Wolfe v. Johnson*, 565 F.3d 140, 159 (quoting *Williams v. Taylor,* 529 U.S. 362, 405, 409 (2000).

The South Carolina Supreme Court simply boiled the question down to whether the prosecution tactics that were designed to mislead defense counsel and to force Terry to testify was a matter of the state exercising its wide discretion in proving "its case by evidence of its own choice." *Id.* at 66-67, 329 (quoting *Old Chief*, 519 U.S. at 186). In doing so, the state supreme court misapplied the United States Supreme Court reasoning in *Old Chief*, which was simply that the government can choose to present its evidence rather than accept the defense offer to stipulate, while ignoring the United States Supreme Court's long line of relevant and controlling cases which establish that the prosecution's affirmative misrepresentation regarding the intended scope and nature of its presentation of its case-in-chief, designed specifically to mislead the defense and force the defense to alter its intended trial strategy, violates fundamental requirements of due process.

The undisputed evidence in this case is that the prosecutors: (1) requested a hearing pretrial to determine the admissibility of Terry's statements while knowing that the state would not offer the statements in evidence during trial; (2) intended to force Terry to testify in order to put his statements before the jury; (3) would not have informed defense counsel even had they asked that the statements would not be offered; (4) sat silently when defense counsel informed the jury in opening that Terry had confessed; and (5) at the last minute moved to exclude the statements from evidence. This scenario raises the issue not of simple trial strategy in presenting the state case, but a violation of the Due Process Clause of the Fourteenth Amendment, which forbids a prosecutor from deliberately misleading a capital defendant about the evidence and issues to be addressed during trial in order to gain an unfair advantage over the defense. As the former Chief Justice of the South Carolina Supreme Court stated in his dissent from denial of relief during the direct appeal of this case:

In my opinion, the solicitor's actions in this case constitute "sandbagging." I would not condone this type of conduct, but would hold under these circumstances the refusal to admit the statement was reversible error.

*State v. Terry*, 529 S.E.2d 274, 279 (S.C. 2000) (Finney, C.J., dissenting)

The US Supreme Court has long cautioned:

The prosecutor is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor--indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935). Likewise, it has long been indisputable that due process, which "safeguard[s] the liberty of the citizen against deprivation through the action of the state, embodies the fundamental conceptions of justice which lie at the base of our civil and political institutions." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935).

It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.

*Id.* Due process is also violated "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Apart from whether the State relies deliberately on perjured testimony or simply allows perjured testimony to go uncorrected, due process also requires fundamental fairness in the

procedures used by the state. As the United States Supreme Court has stated in the context of the constitutionality of discovery rules requiring the defense to give notice of alibi:

> The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played.

*Williams v. Florida*, 399 U.S. 78, 82 (1970).

> [T]he ends of justice will best be served by a system of liberal discovery which gives both parties the maximum possible amount of information with which to prepare their cases and thereby reduces the possibility of surprise at trial.

*Wardius v. Oregon,* 412 U.S. 470, 473 (1973). Rules and procedures "designed to enhance the search for truth in the criminal trial" are protected by due process. *Williams*, 399 U.S. at 82. When the procedures include withholding favorable evidence from the defense, *Brady v. Maryland*, 373 U.S. 83 (1963), or allowing the state to present damaging evidence without affording the defense the opportunity to rebut, *Gardner v. Florida*, 430 U.S. 349 (1977), due process is violated.

Due process is also offended where the prosecutor or the court acts in good faith but the defendant is misled to his detriment in a fundamentally unfair fashion due to lack of notice of the issues to be addressed. Specifically, in *Lankford v. Idaho*, 500 U.S. 110 (1991), the United States Supreme Court held that due process was violated, where at the time of the capital sentencing hearing, the prosecutor had advised the defendant and the court numerous times that the state would not be seeking the death penalty, but the trial court nonetheless sentenced the defendant to death, as was the court's power under Idaho law. Thus, the issue was one of adequate procedure rather than of substantive power. *Id*. at 119. Focusing on the importance that we attach to the concept of fair notice as the bedrock of any constitutionally fair procedure, *id*. at 121, the Court vacated the death sentence.

> Secrecy is not congenial to truth-seeking. . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it. Nor has a better way been found for generating the feeling, so important to a popular government, that justice has been done.

*Id*. at 121-22 (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951)). The Court observed specifically that if defense counsel had been notified that the trial judge was contemplating a death sentence, counsel would have presented evidence and argument on that matter rather than relying simply on the prosecution's pretrial and trial statements, coupled with the prosecutor's presentation of no evidence in sentencing and recommendation of only an indeterminate life sentence. The Court noted that defense counsel had not addressed the question of the appropriateness of the death penalty because these arguments were entirely inappropriate in a discussion about the length of petitioner's possible incarceration. *Id*. at 122. Thus, the Court clearly recognized that due process was violated, without any deliberate misconduct by the state or the court under the circumstances. The defense was misled simply by the trial court's silence on the matter, which had the practical effect of concealing from the parties the principal issue to be decided. *Id*. at 126. The lack of notice to the defense created an impermissible risk that the adversary process may have malfunctioned in this case. *Id*. at 127.

Like presentation of false evidence or lack of notice of the issues to be decided, due process is violated by the government's violation of this Court's long held "strictures against misrepresentation." *Kyles v. Whitley*, 514 U.S. 419, 432 (1995). Due process precludes, for example, state creation of a "false dilemma" by presenting one picture of the evidence before the jury while at the same time precluding the defense from presenting to the jury the accurate picture of the evidence. For example, in *Skipper v. South Carolina*, 476 U.S. 1 (1986), the state presented

evidence and argued to the jury that the capital defendant posed a danger to other inmates if sentenced to life imprisonment (rather than the death penalty) but then relied on a state evidentiary rule to preclude the defendant from offering evidence of adaptability to prison life. Likewise, in *Simmons v. South Carolina*, 512 U.S. 154 (1994), the state asserted the capital defendant's future dangerousness if not sentenced to death, "while at the same time concealing from the sentencing jury the true meaning of its non-capital sentencing alternative, namely, that life imprisonment meant life without parole." *Id*. at 162. Both instances violated due process because "[the State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole." *Id*. at 171.

The state also set up a false dilemma in this case. The state sought a pretrial hearing on the admissibility of Terry's statements, knowing that the perception created was that the state intended to offer those statements in evidence. The defense was entitled to reasonably rely on the accuracy of this perception, just as the defense was entitled to rely on the state's assurance that *Brady* was complied with "through an open file policy." *See, e.g.*, *Banks v. Dretke*, 540 U.S. 668, 693 (2004); *Strickler v. Greene*, 527 U.S. 263, 283 n.23 (1999). In short, when the state has "misleadingly represented" the true facts to the defense, due process is violated when the defense detrimentally relies on that misleading representation. *Banks*, 540 U.S. at 693.

This principal has been recognized implicitly by state courts, including the South Carolina Supreme Court. For example, in *State v. Jones*, 541 S.E.2d 813 (S.C. 2001), which involved the same prosecutor's office as this case, the court recognized that due process was violated due to reasonable reliance by the defense on the actions of the trial court and the prosecutor that led to

fundamentally unfair detrimental results for the defense.  In *Jones*, in a charge conference held prior to closing statements, the court informed the parties of its intent to instruct that "[a] reasonable doubt is the kind of doubt that would cause a reasonable person to hesitate to act." Neither party objected.  After defense counsel structured his closing argument around this anticipated charge and specifically told the jurors they would be given the hesitate to act instruction by the court, the State objected for the first time and the trial court declined to give this charge. The South Carolina Supreme Court held that it was fundamentally unfair to alter the reasonable doubt charge after [defense counsel] structured and delivered his argument around the "hesitate to act" language.  *Id.* at 821.  The court specifically noted that [t]he effect of the judge's after the fact decision to excise the " hesitate to act" language from his charge was to diminish trial counsel's credibility in the eyes of the jury.  *Id.*  Likewise, the court noted that the trial court had merely acceded to the solicitor's demand in altering the charge and reminded prosecutors in Jones that they are ministers of justice and not mere advocates.  *Id.*

The Mississippi Supreme Court also vacated a death sentence where the trial court abused its discretion in a capital sentencing hearing by precluding testimony in mitigation of a licensed social worker, based on the state's objections that she could not give expert opinions as only a social worker and the state's unfounded hearsay objections.  *Fulgham v. State*, 46 So.3d 315, 335 (Miss. 2010).  While the court did not reverse on the separate issue of prosecutorial sandbagging to the detriment of the defense, the court noted that the prejudice due to exclusion of the expert testimony was compounded and exacerbated by the fact that the prosecution did not object to the testimony at any time prior to trial, despite ample evidence of the intended testimony.  Instead, the state waited until after defense counsel informed the jury that it would hear testimony from the

expert and the witness had been qualified as a social worker without objection by the state.  See also *Ramchair v. Conway*, 601 F.3d 66 (2nd Cir. 2010)) (appellate counsel ineffective in robbery case in failing to adequately assert as error the trial court's denial of a motion for mistrial when the prosecution without notice pretrial or through two prior trials on the same charge, elicited evidence that defense counsel had been present at the line-up and failed to object, which cast the defense counsel as a witness against his client on the central issue in the case).

Here, Terry's prosecutors also misled the defense to petitioner's detriment.  The prosecutors knew full-well that, following the trial court's ruling—at the state's behest—that Terry's statements were admissible, the defense would likely seek to pre-emptively inform the jury about the statements.  See, *e.g.*, *Ohler v. United States*, 529 U.S. 753 (2000) (recognizing that a defendant facing cross-examination with evidence of a prior conviction may choose to preemptively introduce that evidence in direct examination); *Bacon v. Lee*, 225 F.3d 470, 485 (4th Cir. 2000) (recognizing that defense counsel may reasonably choose to "remove the sting" of anticipated, damaging evidence by presenting the evidence first).

The prosecutors withheld the information that the state would not present evidence of the statements during trial specifically because the state hoped to force Terry to testify.  App. 2590, 2775.  The easily anticipated action of defense counsel relying on the misrepresentation was to inform the jury in opening that Terry had confessed and that the jury would hear this information.  That is what happened.  And, that is what the prosecutors intended to happen by their deception.  As the prosecutor explicitly argued during the hearing on the motion *in limine*:  "[B]y virtue of our decision in regard to trial tactics we have prohibited the defendant from doing nothing in regard to asserting a defense."  App. 1380.  The stage was thus set that the jury was told by defense counsel

that evidence would be presented and—absent the state presenting that evidence—the only way that evidence would be presented was through cross-examination of the state witnesses by defense counsel or testimony by Terry. With the state affirmatively preventing admission through cross-examination with its motion *in limine*, Terry either had to testify or the jury would not hear the evidence defense counsel promised in opening during the trial.

If the state had not intended to create this false dilemma, the prosecutors would have disclosed pretrial that the state would not offer the confession. At minimum, an honest prosecutor seeking only justice and not simply to win at all costs would have spoken up during opening statements, when it was apparent that the defense anticipated admission of this evidence, to avoid having the jury informed that the defendant confessed (not just to these crimes but to yet another murder) when the jury would hear no such evidence during the trial.

The prejudice from the state's intentional misrepresentation is also clear. First, the defense intended to rely on a "reasonable doubt" defense but was led to inform the jury in opening of Terry's "confession" to not just these offenses, but also a confession to a separate murder (that never happened). Thus, the sole defense theory was demolished before the first witness was called. *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) ("A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him"). Second, defense counsel's credibility was destroyed by informing the jury of intended evidence during opening statements and then failing to produce that evidence. "[L]ittle is more damaging than to fail to produce important evidence that had been promised in an opening." *Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir.1988). *See, e.g., Ouber v. Guarino,* 293 F.3d 19 (1st Cir. 2002) (counsel ineffective in drug trafficking case for promising the jury four times

in the opening to call the defendant as a witness, but then failing to keep those promises); *English v. Romanowski*, 602 F.3d 714 (6th Cir. 2010) (counsel ineffective in assault with intent to commit murder case for failing to adequately investigate prior to informing the jury in opening statements that the defendant's girlfriend would be called as a witness to corroborate the claim of self-defense); *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003) (counsel ineffective in sexual assault and robbery case for failing to investigate and interview exculpatory eyewitnesses and for making promises in his opening statement to the jury that he did not keep); *People v. Lewis*, 609 N.E.2d 673 (Ill. App. Ct. 1992) (counsel ineffective in murder case for promising jury in opening to introduce defendant's pretrial statement which was inadmissible and court would not admit). The South Carolina Supreme Court's reliance on *Old Chief* to excuse the clear misconduct of the prosecutors in this case is contrary to the holding of that case, as evidenced by its incongruity with other United States Supreme Court precedents. The South Carolina Supreme Court's opinion is objectively unreasonable, and this Court should grant petitioner habeas relief.

Respondent attempts to advance the notion that petitioner is complaining of a discovery violation or raising a *Brady* claim, Return and Memorandum of Law in Support of Motion for Summary Judgment[1], p. 38- 39, but those are red herrings. Terry is not asking this Court "to create a free-standing due process right to discovery of prosecutorial trial strategy." *Id.* at 39. Terry seeks a ruling that the prosecutors—representatives of the State of South Carolina—engaged in deceptive trial tactics to secure a death sentence in this capital trial and that such conduct does not find refuge in *Old Chief*. Indeed, the South Carolina Supreme Court's interpretation of *Old Chief* places it firmly at odds with a whole line of United States Supreme Court cases that insist on fair

---

[1]        Docket No. 31.

play in the courtroom. The opinion rendered in this case by the South Carolina Supreme Court cannot be reconciled with either the meaning of *Old Chief* or any of the other cases cited in this brief. For these reasons, the grant of habeas relief is proper because the South Carolina Supreme Court's decision is an unreasonable application of clearly established federal law.

Also, the South Carolina Supreme Court unreasonably applied *Strickland* when it found that, while counsel were deficient in disclosing that Terry confessed to these crimes and another murder while continuing to pursue a "reasonable doubt" defense, there was no prejudice because of the strength of "the evidence the State presented during the guilt phase of trial" to establish Terry's guilt. The South Carolina Supreme Court's conclusion, too, is contrary to *Strickland* because the court assumed there was no prejudice in sentencing due to the strength of the State's evidence establishing guilt. This prejudice analysis has been rejected by the United States Supreme Court.

In establishing the proper standard to be applied in determining ineffective assistance of counsel claims in *Strickland v. Washington*, 466 U.S. 668 (1984), the Court has held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.

> The ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process.

*Id.* at 696.

Subsequently, in the specific context of addressing the prejudice from counsel's failure to adequately investigate and present mitigation evidence in capital sentencing, the United States Supreme Court held that the court must "evaluate the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams v. Taylor*, 529 U.S. 362, 398 (2000). The Court also made clear that prejudice can be established in capital sentencing even if the state's evidence of guilt and aggravation is not undermined in any way, but "the jury's appraisal of [the petitioner's] moral culpability" is "influenced." *Id.* ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case").

In the Court's decisions post-*Williams*, which address the specific context of capital sentencing and counsel's failure to adequately present mitigation, the Court clarified that "a reasonable probability" of a different outcome means merely "a reasonable probability that at least one juror would have struck a difference balance." *Wiggins*, 539 U.S. at 537. That different balance is analyzed not just with the difference in evidence the jury would have heard had counsel performed adequately, but in whether "the jury's appraisal' of . . . culpability" would have been "influenced." *Rompilla v. Beard*, 545 U.S. 374, 393 (2005). In short, the jury must be "allow[ed] . . . to accurately gauge [the petitioner's] moral culpability" in determining whether a death sentence or a sentence of life imprisonment is most appropriate. *Porter v. McCollum,* 558 U.S. 30, 130 S. Ct. 447, 454 (2009).

The Court also made clear in *Florida v. Nixon*, 543 U.S. 175 (2004), that counsel's deficient conduct may be prejudicial even when the evidence before the jury is not altered and only the

arguments of the defense are altered. Specifically, in *Nixon*, the Court held that trial counsel's "failure to obtain the defendant's express consent to a strategy of conceding guilt in a capital trial" is not automatically deficient performance and must be evaluated under the *Strickland* test for prejudice rather than under the test of *United States v. Cronic*, 466 U.S. 648 (1984), which presumes prejudice when defense counsel's failure to challenge the government's case is "complete." *Bell v. Cone,* 535 U.S. 685, 697 (2002).

In analyzing the permissible contours of counsel's formulation of the "overarching defense strategy," *Nixon*, 543 U.S. at 187, the Court considered the unique challenges presented in capital cases.

> [T]he gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus. Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming and the crime heinous. In such cases, "avoiding execution [may be] the best and only realistic result possible." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.9.1, Commentary (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 1040 (2003).

*Id.* at 191. In circumstances where guilt is clear, counsel must "strive at the guilt phase to avoid a counterproductive course," such as presenting logically inconsistent strategies in the trial and sentencing. *Id.* at 191-92 (citing, *inter alia*, Lyon, *Defending the Death Penalty Case: What Makes Death Different?*, 42 Mercer L. Rev. 695, 708 (1991) ("It is not good to put on a 'he didn't do it' defense and a 'he is sorry he did it' mitigation. This just does not work. The jury will give the death penalty to the client and, in essence, the attorney")). Thus, "[c]ounsel . . . may reasonably decide to focus on the trial's penalty phase," *id*. at 191, and "counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in 'a useless

charade,'" *id.* at 192 (quoting *Cronic*, 466 U.S. at 656-57 n.19). Thus, the Supreme Court concluded in *Nixon*, that counsel in a capital case "must consider in conjunction both the guilt and penalty phases in determining how best to proceed." Counsel's conduct may well be reasonable under the *Strickland* standard "if counsel's strategy, given the evidence bearing on the defendant's guilt," *id.* at 191, is "to concede, at the guilt phase of the trial, the defendant's commission of murder, and to concentrate the defense on establishing, at the penalty phase, cause for sparing the defendant's life," *id.* at 178. Conversely, it is clear that capital defense counsel may be ineffective and the conduct thereby prejudicial in failing to concede guilt – with the defendant's permission -- during the trial and to focus on the ultimate question of the appropriate sentence. *See McCoy v. Louisiana*, 138 S. Ct. 1500, 1514 (2018) (J. Alito dissenting, "That approach [to advance an innocence argument in the face of overwhelming proof of guilt] stood no chance of winning an acquittal and would have severely damaged English's credibility in the eyes of the jury, thus undermining his ability to argue effectively against the imposition of a death sentence at the penalty phase of the trial").

In the state court, Terry specifically asserted that counsel's conduct was deficient in disclosing that Terry confessed to these crimes and another murder while continuing to pursue a "reasonable doubt" defense. Counsel should have conceded guilt and focused on the ultimate question of whether Terry would be sentenced to death or life imprisonment. The South Carolina Supreme Court assumed that counsel's conduct was deficient "in not changing their strategy to gain credibility with the jury." The court found no prejudice, however, because of the strength of "the evidence the State presented during the guilt phase of trial" to establish Terry's guilt.

This prejudice analysis is blatantly erroneous, and contrary to *Strickland*, because it presumes no possible prejudice in sentencing from the failure to concede guilt simply because the state's evidence of guilt was strong. This completely ignores the realities the Supreme Court recognized in *Nixon* that a conviction may be a foregone conclusion and effective counsel must focus on maintaining credibility and avoiding a useless charade that will only alienate the sentencing jury. This also ignores the Court's holding in *Williams* that prejudice in sentencing may be clear even when the state's evidence of guilt and evidence in aggravation is not challenged or rebutted.

Terry's trial counsel even acknowledged in the post-conviction proceedings that they were aware that the state had "pretty strong evidence showing guilt" and was "going to get to the [death] penalty phase relatively easily." App. 2519-20. Given these facts alone, counsel's determination to assert a "reasonable doubt" defense, even after informing the jury that Terry confessed, was prejudicial in that counsel had no credibility with the jury and knew that going into the trial.

As the Supreme Court long ago recognized in a noncapital trial: "If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *Cronic*, 466 U.S. at 656 n.19. Other courts have since recognized in the noncapital context that when counsel concedes a defendant's guilt as a "tactical decision, designed to lead the jury towards leniency on other charges and to provide a basis for a later argument . . . for a lighter sentence," such a "tactical retreat[]" is "deemed to be effective assistance." *United States v. Tabares,* 951 F.2d 405, 409 (1st Cir. 1991) (citation and internal quotation marks omitted). *See also Haynes v. Cain*, 298 F.3d 375, 380-82 (5th Cir. 2002);

*Underwood v. Clark*, 939 F.2d 473 (7th Cir. 1991); *United States v. Holman*, 314 F.3d 837, 840 (7th Cir. 2002).

The courts in the context of capital cases have long recognized this same principal when counsel acknowledges guilt in order to enhance the case for sparing the defendant's life in the sentencing phase. In *Strickland* itself, counsel was found to have provided effective assistance even though the capital defendant pleaded guilty and counsel did not prepare and present character or psychiatric evidence or request a presentence report. Counsel chose instead "to rely as fully as possible on [the defendant's] acceptance of responsibility for his crimes." 466 U.S. at 699. In short, counsel's argument focused almost exclusively on asserting that "remorse and acceptance of responsibility justified sparing him from the death penalty." *Id*. at 673.

Consistent with the Supreme Court's holdings and sheer logic, experienced capital defense counsel have long recognized that "any capital trial must focus on how to save the client's life" by trying to "convince a jury full of people who think the death penalty is a good idea to make an exception in this particular case." *Lyon*, *supra*, at 696. Actually engaging in a useless charade in the trial may and likely will enhance the odds that the defendant will be sentenced to death when the charade is rejected by the jury. Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 304 (1983) ("[C]ounsel in a capital case who presents a seemingly skilled, but unsuccessful, defense at the guilt phase may have tried and lost the issue of his client's worthiness to live before the penalty trial has even begun"); White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standards of Care*, 1993 U. Ill. L. Rev. 323, 357 (1993) ("By allowing the defendant to take contradictory positions at guilt and sentencing, the

defense counsel loses credibility with the sentencer, thus reducing the defendant's chances for a life verdict").

> Just as it would be foolish to try a case with two conflicting defenses ("I wasn't there, but if I was, I was insane"), it is literally deadly to fail to integrate the theory of the case with the theory of mitigation. If the jury perceives defense counsel as insincere or tricky because his theories conflict, a jury will undoubtedly take that out on the client.

Lyon, *supra*, at 708. Thus, in instances where counsel is clear that the State has overwhelming evidence of guilt and will "get to the [death] penalty phase relatively easily," Tr. 2519-20, as in this case, counsel must focus on the overriding goal of obtaining a life sentence and choose a trial strategy that is consistent with the sentencing strategy.

> Insuring that the trial will complement the overall strategy is critical. That is, if a life sentence is the goal toward which you are aiming, and the evidence of guilt is overwhelming and undeniable, then admit guilt, starting with voir dire and continuing through opening statement and closing argument. Disarm the prosecution by preparing the jury for the bad things to come. . . . In short, visualize the case as a play in which the trial is only one of many acts, and then be sure that your trial presentation is consistent with the entire production.

*Id.* at 353.

Here, however, Terry's chances of obtaining a life sentence were destroyed because defense counsel lost all credibility with the jury in informing the jury that he "confessed," when no such evidence was presented during the trial. Counsel's failure to adjust their strategy resulted in virtual chaos in sentencing because counsel lost all credibility with the jury. By the time of sentencing, it was clear that counsel had "engage[d] in 'a useless charade.'" *Nixon*, 543 U.S. at 192. Counsel had flipped completely from the opening assertions of "reasonable doubt," which were destroyed by counsel's simultaneous admission of a "confession," to explicitly arguing in sentencing: "Gary Terry is a rapist. He's a murderer. He's an invader of homes. All that is true."

Tr. 2099.  Indeed, the jury deliberated barely over an hour in sentencing before rendering a death

verdict.  Tr. 2121, 2123.

Aside from simple logic, the information available from capital jury studies reveals that

pursuit of a "reasonable doubt" defense in these circumstances was actually harmful to Terry.  By

presenting a "denial defense," which includes a "reasonable doubt" defense, as opposed to an

"admission defense" (while at the same time admitting Terry confessed), counsel increased the

odds of a death sentence.

> [J]uries in denial defense cases imposed death sentences twice as often as they
> imposed life sentences, while juries in admission defense cases chose a life verdict
> over a death sentence by a three-to-two ratio.

Scott E. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and

the Death Penalty*, 83 Cornell L. Rev. 1557, 1574-75 (Sep. 1998) (cited in *Nixon*, 543 U.S. at 192).

The only exception to this rule is in the limited circumstances–inapplicable here–of "cases that

involve multiple criminal actors and only circumstantial evidence as to which of the participants

acted as the ringleader."  *Id*. at 1579.

A "denial defense" is harmful, such that "a defendant is essentially playing lottery odds by

relying on an all-or-nothing guilt phase strategy that challenges the prosecution in the hope of

producing a lingering doubt that will secure a life sentence."  *Id*. at 1589.  This is so for at least two

reasons.

First and foremost, it requires counsel and the defendant to appear (and actually)

"deceptively shift positions" from the trial to the sentencing, *id*. at 1587, as counsel did in this

case.  In essence, the jury will view the defendant and counsel as manipulative in sentencing.  *Id*.

at 1590.

Second, when the defendant has denied responsibility during the trial, the jury "view[s] cynically a case in mitigation that centers on influences beyond the defendant's control – such as child abuse – as nothing more than a final attempt to deny responsibility." *Id.* In this case specifically, Terry's counsel argued in the trial that the state's evidence, including fingerprint and DNA evidence, meant nothing; there was no rape; and there was reasonable doubt of Terry's guilt. Then, in sentencing, counsel conceded: "Gary Terry is a rapist. He's a murderer. He's an invader of homes. All that is true." Tr. 2099. He asked for nothing more than that the jury "draw a line" because of Terry's "brain damage." Tr. 2100. The South Carolina Supreme Court's decision on this point is an unreasonable application of *Strickland* on the facts of this case, and, additionally, is contrary to *Strickland*. For these reasons, a grant of relief is proper.

## TERRY'S UNEXHAUSTED CLAIMS AND RESPONSE TO RESPONDENT'S MOTION TO STRIKE EXHIBITS

With respect to Grounds II-V offered by Terry in his petition for writ of habeas corpus, this Court must address the merits of Terry's claims because there is cause to excuse the procedural defaults under the United States Supreme Court's opinion in *Martinez v. Ryan*, 566 U.S.1 (2012). This Court should deny Respondent's Motion to Strike Petitioner's exhibits.

In *Martinez* the United States Supreme Court recognized a narrow exception to the holding in *Coleman v. Thompson*, 501 U.S. 772 (1991) such that inadequate assistance of counsel at initial-review collateral proceedings may establish cause to excuse a prisoner's procedural default of a claim of ineffective assistance of counsel at trial. This is not a constitutional right, but an exception in equity applicable in situations in which a state requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding. It is available when the state did not appoint counsel in the initial-review collateral proceedings, or where appointed counsel in such a

proceeding in which such a claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984). To overcome the default, the prisoner must establish that the claim has some merit.

To prevail on a claim of ineffective assistance of counsel, a petitioner ordinarily must satisfy both parts of the two-part test set forth in *Strickland*. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000); *Jackson v. Kelly*, 650 F.3d 477, 493 (4th Cir.2011). The petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88; *accord Wiggins*, 539 U.S. at 521; *Williams*, 529 U.S. at 390-91; *Sharpe v. Bell*, 593 F.3d 372, 382 (4th Cir.2010). In making this determination, a court considering the habeas corpus petition "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *accord Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *Darden v. Wainwright*, 477 U.S. 168, 185-86 (1986); *United States v. Tucker*, 603 F.3d 260, 264 (4th Cir. 2010).

If counsel's performance is found to have been deficient under the first part of the *Strickland* standard, to obtain relief the petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *accord Wiggins*, 539 U.S. at 534; *Williams*, 529 U.S. at 391; *Gray v. Branker*, 529 F.3d 220, 234 (4th Cir.2008). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," *Strickland*, 466 U.S. at 694, and "[t]he likelihood of a different result must be substantial, not just conceivable," *Harrington*, 131 S.Ct. at 792.

The exhibits attached to the habeas petition are relevant for this Court to assess Terry's *Martinez* claim in the context of Terry's unexhausted claims and this Court must deny Respondent's motion to strike the exhibits.

These exhibits show, for example, that trial counsel, Elizabeth Fullwood, acknowledges she should have objected to the damaging testimony of Tamantha Griffin, Terry's ex-wife, who testified to a purported rape by Terry during their marriage, and offered as aggravation testimony by the state. Exhibit 1. See Claim V below. She also clarifies that neither she nor Duffie Stone had a strategic reason for limiting the mitigation evidence they offered the jury. See Claim IV.

Post-conviction counsels', Wayne Floyd and Lisa Armstrong's, affidavits also attest to serious lapses in their performance. Exhibits 25 and 26. Both attorneys acknowledge they did not interview any of trial counsel's mitigation witnesses or experts, and that, had they known that Terry's extensive abuse would have supported the defense of guilty but mentally ill, they would have raised the issue in post-conviction hearings. See Claim IV. Armstrong also reveals they did not speak to any of the medical experts retained by trial counsel in this case either, and that they failed to raise the issue of Duffie Stone's conflicts of interest. See Claims II and IV.

Likewise, the exhibits that Terry attached to his petition expose, among other things, an intractable conflict of interest on the part of trial counsel, the Attorney General's knowledge of that conflict at the time of the initial post-conviction relief hearing, Claim II, evidence that trial counsel's *voir dire* was fatally ineffective, Claim III, and significant mitigation that was not uncovered by either trial or PCR counsel. *See* Claim IV. These exhibits are necessary for Terry to raise these claims. *See McFarland v. Scott*, 512 U.S. 849, 855 (1994) (Congress' adoption of Anti-Drug Abuse Act of 1988, 21 U.S.C. § 848(q), creating right to counsel and support services in

capital cases "reflects a determination that quality legal representation is necessary in capital habeas corpus proceedings in light of 'the seriousness of the death penalty and . . . the unique and complex nature of the litigation'" and that the services of both counsel and "of investigators and other experts may be critical in the preapplication phase of a habeas corpus proceeding, when possible claims and their factual bases are researched and identified" (quoting *id.* § 848(q)(7))); *Brown v. Vasquez*, 952 F.2d 1164, 1167-68 (9th Cir.), *cert denied*, 503 U.S. 1011 (1992) (heavy burden that current law places on habeas corpus prisoners to allege and litigate all possibly available constitutional claims in initial petition creates need for prepetition assistance of counsel and other procedural devices to enable petitioners to meet burden). Respectfully, the exhibits expose the deficiencies that characterize Terry's experience in South Carolina state court to date, and this Court should grant his request for an evidentiary hearing so this Court may assess the credibility of various witnesses and resolve outstanding genuine issues of material fact.

In its Motion to Strike Exhibits, Respondent argues that Terry failed to act diligently in attempting to pursue the current unexhausted claims because he did not "seek an evidentiary hearing in state court in the manner prescribed by state law on these claims." Docket No. 131, p. 7. But that statement ignores Terry's attempt to secure a second-in-time post-conviction relief proceeding that eventually was dismissed by the state court (and which Respondent there argued Terry was not entitled to). In any event, Respondent's opposition to an evidentiary hearing and motion to strike are based on the same flawed logic that fails to give appropriate consideration to the Supreme Court's decision in *Martinez.*

Respondent's primary argument against expansion of the record and holding an evidentiary hearing is based on 28 U.S.C. §2254(e)(2). Respondent asserts that provision does not allow courts

to review evidence not presented to the state court, except under circumstances not applicable here, even when considering a claim raised under *Martinez v. Ryan*. Respondent's position, if accepted, would eliminate all federal review of claims raised under *Martinez* and would eviscerate the equitable protections created by the Supreme Court in *Martinez*.

Federal courts generally lack jurisdiction to review procedurally defaulted claims. *See, e.g., Maples v. Thomas*, 565 U.S. 266, 280 (2012). A federal court may, however, consider the merits of a procedurally defaulted claim if the petitioner shows "cause for the default and prejudice from a violation of federal law." *Martinez*, 566 U.S. at 10 (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Under *Martinez*, ineffective assistance of state PCR counsel can constitute "cause" to excuse the procedural default of an ineffective assistance of trial counsel claim. Thus, *Martinez* created an exception to the general rule barring review of claims not previously presented in state court when the failure to raise the claim is attributable to PCR counsel's ineffectiveness. To prove the procedural default of a claim should be excused under *Martinez*, a habeas petitioner must prove:

> (1) The claim of 'ineffective assistance of trial counsel' was a 'substantial' claim; (2) the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the 'initial' review proceeding in respect to the 'ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an 'ineffective assistance of trial counsel [claim]… be raised in an initial-review collateral proceeding.

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 132 S. Ct. at 1318-19, 1320-21 (emphasis in original).

A petitioner's burden to overcome procedural default pursuant to *Martinez*—proving a substantial claim of trial counsel ineffectiveness was not previously raised in state court due to collateral counsel's ineffectiveness—necessarily requires consideration of evidence outside the state court record. As the Supreme Court recognized in *Martinez*, answering the questions relevant

to whether there has been ineffective assistance of counsel often requires extensive factual development. 566 U.S. at 11-12 (stating IAC claims can require "investigative work" and development of an "evidentiary basis" that "often turns on evidence outside the trial record."). For example, "to determine whether an attorney's performance was deficient, it is often necessary to ask the attorney to state the strategic or tactical reasons for his or her actions. To determine prejudice, it is often necessary to authorize discovery and conduct an evidentiary hearing to assess the effect of the attorney's deficient performance." *Detrich v. Ryan*, 740 F.3d 1237, 1246-47 (9th Cir. 2013). Thus, to give effect to *Martinez*, the federal court must allow for expansion of the record.

Respondent asserts that, despite the Supreme Court ruling in *Martinez*, PCR's counsel's failure to present factual support for a claim in state court should be attributed to the petitioner under §2254(e)(2) which provides that "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim" unless certain exceptions are met. Numerous circuit courts of appeal have rejected Respondent's interpretation of §2254(e)(2).[2]

---

[2]     *See, e.g., Hill v. Glebe*, 654 Fed. App'x 294,295 (9th Cir. 2016) ("We reject the government's contention that 28 U.S.C. §2254(e) requires Hill's ineffective assistance claims to be determined solely on the record provided to the state courts."); *Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) ("Section 2254(e)(2), however, does not bar a hearing before the district court to allow a petitioner to show 'cause' under *Martinez*."); *Henry v. Warden, Ga. Diagnostic Prison*, 750 F.3d 1226, 1231-32 (11th Cir. 2014) ("When a petitioner asks for an evidentiary hearing on cause and prejudice, neither section 2254(e)(2) nor the standard of cause and prejudice that it replaced apply."); *Dietrich v. Ryan*, 740 F.3d 1237, 1246 (9th Cir. 2013) ("For procedurally defaulted claims, to which *Martinez* is applicable, the district court should allow discovery and hold an evidentiary hearing where appropriate to determine whether there was 'cause' under *Martinez*); *Sasser v. Hobbs*, 735 F.3d 833, 853 (8th Cir. 2013) (holding that with regard to petitioner's claims with at least some potential merit, "the district court is authorized under 28 U.S.C. §2254(e)(2) and required under Trevino to 'hold an evidentiary hearing on the claim[s].'"); *Brizendine v.*

Other courts have recognized that §2254(e)(2) bars factual development in federal court where a petitioner "failed to develop the factual basis of a claim in state court," but a petitioner asserting inadequate assistance of state post-conviction counsel as "cause" is not raising a "claim" for relief, but is instead "seeking, on an equitable basis, to excuse a procedural default." *Detrich v. Ryan*, 740 F.3d 1237, 1247 (9th Cir. 2013). Indeed, *Martinez* itself explicitly made clear that an allegation of ineffective assistance of PCR counsel is not a constitutional claim for relief. 566 U.S. at 14-16. Thus, §2254(e)(2), which addresses the factual basis of "a claim" does not operate to bar the introduction of new evidence in these circumstances.

Further, *Martinez* held that a prisoner who did not receive adequate representation in state court is not "at fault" for the default of their claims. *See Sasser v. Hobbs*, 735 F.3d 833, 853 (8th Cir. 2013) ("Thus, the district court is authorized under 28 U.S.C. §2254(e)(2) and required under Trevino to 'hold an evidentiary hearing on the claim[s].") (quoting *Williams v. Taylor*, 529 U.S. 420, 437 (2000) (explaining §2254(e)(2) does not preclude district courts from holding an evidentiary hearing if the petitioner was "unable to develop his claim in state court despite diligent effort"). Because a petitioner with a claim that his PCR counsel were ineffective is not at fault for

---

*Parker*, 644 Fed. App'x 588, 589 (6th Cir. 2016) (holding petitioner was entitled to an evidentiary hearing on Martinez claim which had at least "some merit"); *Grimes v. Superintendent Graterford SCI*, 619 Fed. App'x. 146, 149 (3rd Cir. 2015) ("an evidentiary hearing should have been conducted to enable the District Court to determine if Grimes can satisfy the Martinez prongs and establish the cause and prejudice necessary to excuse Grimes's procedure default of his IAOTC claim."); *see also Coleman v. Hardy*, 628 F.3d 314, 320 (7th Cir. 2010) (holding evidentiary hearing was warranted to evaluate petitioner's claim of actual innocence to excuse a petitioner's procedural default of ineffective assistance of trial counsel claim); *Cristin v. Brennan*, 281 F.3d 404, 412-13 (3d Cir. 202) ("it was within the plenary authority of the District Court to order an evidentiary hearing on the subject of Cristin's excuses for his procedural default and §2254(e)(2) is inapplicable to those hearings").

his procedural default, *see Martinez*, 566 U.S. at 17, he has not "failed to develop" his claim for the purposes of §2254(e)(2) and the statute does not bar factual development in federal court.

Additionally, because factual development is necessary to prove ineffective assistance of counsel, *Martinez* would be a "dead letter" without expansion of the record in federal court. *Detrich*, 740 F.3d at 1246. As the *Martinez* court recognized, when prisoners are deprived of adequate state post-conviction counsel, they are "in no position to develop the evidentiary basis for a claim of ineffective assistance" in state court, 566 U.S. at 11-12, thus proof of ineffective assistance of counsel claims in federal court require "investigative work" and development of an "evidentiary basis." *See id*. The Fourth Circuit has also recognized the need for investigation and factual development in federal habeas under *Martinez*, finding it necessary to appoint independent counsel to "identify[], investigat[e] and present[] potential Martinez claims." *Gray v. Pearson*, 526 Fed. App'x 331, 335 (4th Cir. 2013); *Juniper v. Davis*, 737 F.3d 288 (4th Cir. 2013) (finding appointment of independent counsel "in order to investigate and pursue claims under *Martinez*" is "*ethically required*") (emphasis in original).  This Court similarly found development of facts and evidence reasonably necessary under *Martinez* when it granted funding for additional investigation. Respondent's interpretation of §2254(e)(2) would render independent counsel and investigation in federal habeas meaningless and unnecessary by barring evidence developed in the *Martinez* investigation from being presented.

To give effect to *Martinez*, many federal district courts, including the District of South Carolina, have found expansion of the record and an evidentiary hearing necessary to consider claims raised under *Martinez*.  *See*, *e.g.*, Order, *Stokes v. Byars*, No. 1:16-cv-00845-RBH-SVH (August 9, 2017), ECF No. 129 (ordering an evidentiary hearing on grounds raised under

Martinez); *Green v. Stephens*, No. 4:13-cv-1899, 2017 WL 1929358, at *2 (S.D. Tex. May 10, 2017);

*Carpenter v. Davis*, no. 3:02-cv-1145, 2017 WL 2021415, at *2 (N.D. Tex. May 12, 2017); *Thomas*

*v. Kelley,* No. 6:14-cv-6038, 2017 WL 1239148, at *15 (W.D. Ark. March 31, 2017); *Jones v. Ryan*,

No. 1:98-cv-00240, 2017 WL 264500, at *12, *17 (D. Ariz. Jan. 20, 2017); *Row v. Beauclair*, No.

1:98-cv-00240, 2015 WL 1481416, at *19-20 (D. Idaho, March 31, 2015); *Weber v. Sinclair*, No.

C08-1676RSL, 2014 WL 1671508, at *9 (W.D. Wash. April 28, 2014); *Garcia v. Stephens*, No. 3:06-

cv-2185, 2014 WL 1494024, at *1, *3 (N.D. Tex. April 15, 2014); *Quintero v. Carpenter*, No. 3:09-

cv-00106, 2014 WL 7139987, *81 (M.D. Tenn. Dec. 12, 2014). This Court should follow the well-

reasoned decisions of the courts that have allowed for expansion of the record, deny Respondent's

Motion to Strike, and grant an evidentiary hearing to consider Terry's claims that were defaulted

by his state PCR counsel and determine whether the default is excused due to PCR counsel's

ineffective assistance. *See* Order, *Stokes v. Byars*, 1:16-cv00845-RBH-SVH (August 9, 2017), ECF

No. 129 ("[T]he undersigned has determined that an evidentiary hearing is warranted so that the

undersigned may properly assess whether any procedural default of Grounds Six and Seven should

be waived [under *Martinez*], and if so, whether the merits of the underlying claims warrant habeas

relief."). Respectfully, this Court should deny Respondent's Motion to Strike Petitioner's

exhibits.

## ARGUMENTS

**II.     Terry's right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution was violated by trial counsel's undisclosed actual conflict of interest in representing Terry and simultaneously representing the State of South Carolina and numerous law enforcement agencies involved in his prosecution and capital sentencing.**

Terry recounted the factual basis for this claim in his petition. Docket No. 16. In short, Terry's trial counsel, Duffie Stone, was employed by the state Insurance Reserve Fund and simultaneously represented the very governmental entities responsible for securing a death sentence against him. Also, Stone was employed as a part-time assistant solicitor while he was representing Terry. Stone never disclosed these conflicts.

Stone labored under an actual conflict of interest throughout his representation of Terry. The Sixth Amendment guarantees the right to counsel unencumbered by conflicts of interest. *Mickens v. Taylor*, 535 U.S. 162 (2001); *Cuyler v. Sullivan*, 446 U.S. 335 (1980); *Holloway v. Arkansas*, 435 U.S. 475 (1978). Actual conflicts of interest may arise from counsel's representation of different parties with competing interests. *Wood v. Georgia,* 450 U.S. 261 (1981); *Holloway, supra*; *Glasser v. United States*, 315 U.S. 60 (1942). As an employee of the Insurance Reserve Fund, Stone was conflicted in two ways. First, the interests of the State of South Carolina were adverse to Terry since the state was actively seeking the death penalty in his case and indeed, representatives of the State of South Carolina testified against him at his trial. But secondly, Stone received a substantial part of his income from the Insurance Reserve Fund, and had a personal stake in continuing to receive appointments from a fund administered by the Attorney General's office. See *People v. Myers*, 46 ill.2d 149, 152 (1970) ("[I]t is difficult, if not impossible, to satisfactorily advise a defendant of the subtle effect which a conflict of interests may have upon an appointed counsel's representation. In this case, there is no indication that the appointed counsel ever undertook to explain to defendant the subconsciously compromising effect which the contingent fee prospects could conceivably have upon his counsel's efforts.") And see *People v. Pendleton,* 52 Ill.App.3d 241, 247 (1977) ("The controlling aspect is not whether he personally

would ever be assigned to assist in the prosecution of a murder case, but whether he is presently accepting and perhaps seeking future assignments from an office which possesses an interest adverse to defendant's").  Representing these South Carolina governmental agencies, Stone was not willing to place himself in an adverse position with respect to his Insurance Reserve Fund clients who were testifying against Terry at his capital trial.

> A lawyer's duty of absolute loyalty to his client's interests does not end with his retainer.  He is enjoined for all time, except as he may be released by law, from disclosing matters revealed to him by reason of the confidential relationship. Related to this principle is the rule that where any substantial relationship can be shown between the subject matter of the former representation and that of a subsequent adverse representation, the latter will be prohibited.

*T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp.265, 268 (S.D.N.Y.1953).

Additionally, because he was not informed of them, Terry did not knowingly and intelligently waive the conflicts of interest.   To be valid, a waiver of a conflict of interest must not only be voluntary, it must be done knowingly and intelligently.  *See United States v. Swartz*, 975 F.2d 1042, 1049-50 (4th Cir. 1992) (waiver not knowing, intelligent, voluntary unless the defendant knows the precise form of conflict of interest that eventually results): *Hoffman v. Leeke*, 903 F.2d 280, 289 (4th Cir. 1990) (Hoffman's waiver not intelligent "because Hoffman could not waive what he did not know.").   The courts indulge every reasonable presumption against waiver of fundamental constitutional rights, and do not presume acquiescence in the loss of fundamental rights.  *Johnson v. Zerbst*, 304 U.S. 458 (1938); *Pitts v. North Carolina*, 395 F.2d 182, 188 (4th Cir. 1968).

In addition to Stone's direct conflicts as a result of his prior and simultaneous representation of the agencies directly involved in Terry's prosecution and sentencing, Stone also

had a conflict because he was a prosecutor for the State of South Carolina during the time he served as Terry's defense counsel.

Specifically, he testified that sometime in 1993 or 1994 he had been appointed as a "special prosecutor" in a case for Lexington County.  Whether this case was on-going during the time of his representation of Terry in Lexington County is unclear.  He also became a part-time prosecutor in South Carolina's Fourteenth Judicial Circuit on July 1, 1997, Exhibit 5 at 3139.  He had "the same duties as the rest of the solicitors in the solicitor's office."  Exhibit 5 at 3135.

Again, neither Terry nor his lead counsel was informed of any of Stone's conflicts during the trial proceedings.  Exhibits 32, 1.   Even during his testimony in Terry's post-conviction proceedings, Stone did not mention his IRF or part-time solicitor work.  This is remarkable for a number of reasons:  (1) the Aleksey PCR hearing, in which the primary challenge was to Stone's conflicts, had occurred four years earlier; (2) Aleksey's counsel had informed Terry's post-conviction counsel, Wayne Floyd and Lisa Armstrong, about Stone's conflicts in 2003, three years prior to Terry's PCR evidentiary hearing; Affidavit of James Brown, Exhibit 9; (3) Armstrong had notes in her file that appear to have been made prior to the evidentiary hearing (as the notes also refer to additional funding requests to be made), which refer specifically to "Insurance Δ fund" and "Jim Brown"; Armstrong Notes, Exhibit 10; and (4) members of the Attorney General's Office, who represented the State in post-conviction proceedings and continue to represent the Respondents, interviewed Stone just days before the PCR hearing and the notes reflect that they were aware of Stone's IRF work and, of course, the issue in Aleksey.  Notes from Attorney General File, Exhibit 11.

Stone's status as a part-time solicitor during his representation of Terry, as well as his status as a "special prosecutor" in the same jurisdiction during the relevant time frame, constitute additional conflicts of interest under the line of United States Supreme Court precedent existing at the time of his trial—*Wood, supra*; *Cuyler, supra*; *Holloway, supra*; and *Glasser, supra*. Terry did not receive information regarding the precise form of the conflicts that developed during his case. *See Wheat v. United States*, 486 U.S. 153, 162-63 (1988) ("The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials . . . Nor is it remiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them."). And *see Mickens* at 168 ("The presumption (that conflicts undermine the adversarial process) was justified because joint representation of conflicting interests is inherently suspect, and because counsel's conflicting obligations to multiple defendants 'effectively sea[l] his lips on crucial matters' and make it difficult to measure the precise harm arising from counsel's errors." (quoting *Holloway* at 489-90).

Terry was represented by counsel wholly conflicted. Appointed by a judge to help him start up his business, and with some indication of a political connection, Stone owed duties to the very entities who made the case against Terry at both the guilt and sentencing phases of his capital trial. Critically, Stone owed duties to the State of South Carolina—in his capacity as an attorney for the Insurance Reserve Fund and as a prosecutor—**while he represented Terry**. Terry was never made aware of Stone's financial stake in continuing to receive appointments from the Insurance Reserve Fund, nor did he know that his own attorney was representing entities trying to have him put to death. These multiple conflicts functioned to put Terry intractably at odds with his

appointed capital counsel, and rendered his trial fundamentally unfair. See *U.S. v. Levy*, 25 F.3d 146, 157 (2nd Cir. 1994) (In a case in which there are myriad conflicts, each cannot be considered in isolation, but rather must be considered together when assessing whether there is a congruence of interests between the lawyer and client). Terry was denied his right to counsel "devoted solely to the interests of his client." *Von Moltke v. Gillies*, 332 U.S. 708, 725 (1948). Stone actively represented conflicting interests in this case through his multiple conflicts. In short, he had actual conflicts that adversely affected his performance. *Strickland v. Washington*, 466 U.S. 668 (1984).

This issue of Stone's conflicts has not been presented to the South Carolina courts because post-conviction relief counsel, Lisa Armstrong and Wayne Floyd, rendered ineffective assistance of counsel. It is clear that Armstrong, at least, was informed of the conflict by attorney Jim Brown who attests that he told her of the issue around July 2003. This issue was a central claim raised by Brown in *Aleksey v. State of South Carolina*, which was heard in November 2002 and July 2003. See Exhibit 9. Also, in Armstrong's notes, she indicates that she intended to set up a meeting with Stone, and lists "Insurance Δ Fund, Jim Brown" as an issue to inquire about. Exhibit 10. Armstrong also attests in her affidavit that she was aware of Stone's "connection" with the Insurance Reserve Fund. Exhibit 26. A Freedom of Information Act request—like the one made by habeas counsel—would have revealed how many "connections" to Terry's case actually existed at the time of his trial. Exhibit 4. Counsel could also have uncovered Stone's employment as a part-time solicitor by researching Stone's other death penalty cases. The record in *Aleksey* would have revealed the conflict. But also, as a solicitor, Stone held a job as a public servant. Counsel should have been able to uncover Stone's very public employment.

PCR counsel's performance was wholly inadequate. As the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (rev. 2003) make clear, "[c]ounsel's obligations in state collateral review proceedings are demanding." Commentary to Guideline 1.1 Objective and Scope of Guidelines. "Because state collateral proceedings may present the last opportunity to present new evidence to challenge the conviction, it is imperative that counsel conduct a searching inquiry to assess whether any mistake may have been made. *Id*. And see Guideline 10.15.1(b) Duties of Post-Conviction Counsel:

> Post-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules. Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review.

It is inexcusable that PCR counsel, then, failed to raise an issue that it clearly had notice of—Stone's employment with the Insurance Reserve Fund and his simultaneous representation of entities involved in the actual presentation of the state's case against Terry. And it is also inexcusable that counsel did not uncover Stone's public employment as a prosecutor. Terry was prejudiced by their substandard performance because if they had raised the issue, it would have been resolved in Terry's favor. PCR counsel's substandard performance excuses the procedural default under *Martinez* and this Court must grant relief.

Respondent does not address this particular claim on its merits, arguing instead that Terry is not entitled to have this court consider the affidavits he submitted both in support of his claim, and in support of his *Martinez* claim that PCR counsel rendered ineffective assistance of counsel. Respondent does note that it is "quite possible" that the PCR attorneys' memories have dimmed over time, suggesting this Court should not find their affidavits credible. Docket No. 129, p. 78.

Respondent's argument concedes the necessity for this Court granting an evidentiary hearing so it can make its own determination as to the credibility of these witnesses.

This Court should consider Elizabeth Fullwood's affidavit wherein she states that she was unaware that Duffie Stone was also a part-time solicitor in another circuit, and worked for the Insurance Reserve Fund, representing governmental entities. She further stated that, had she known, she would have been concerned about his representation of the Richland County Sheriff's Office who provided some of the aggravation witnesses in Terry's case. This Court should also hear from, and assess, PCR counsels' decision not to raise this issue even though it was a very substantial issue in another capital defendant's case—Bayan Aleksey—and they had notice of that fact. See Exhibit 5. This Court should also assess whether PCR counsel's performance was ineffective in light of their admissions they did not seek funding for a mitigation specialist, social worker, psychiatrist, or mitigation investigator, and that they did not interview any of trial counsels' retained mitigation investigators. Additionally, PCR counsel did not speak to medical experts retained by trial counsel, nor did they speak to Elizabeth Fullwood. All of these facts militate in favor of finding that PCR counsel rendered ineffective assistance of counsel, and thus this Court can reach the merits of petitioner's claim under *Martinez*.

**III.    Terry's rights to the effective assistance of counsel and to a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution was violated by trial counsel's failure to conduct adequate and appropriate voir dire or to adequately establish a record and appropriately object in order to preserve the issue for appellate review.**

As in Issue II, the factual basis for this claim is recounted in Terry's petition for writ of habeas corpus. Docket No. 16. Briefly, trial counsel rendered ineffective assistance of counsel when they failed to conduct an adequate *voir dire* sufficient to ferret out two jurors, Robin Ritchie

Smith and Norwood Brown, who never could have imposed a life sentence in this case, and further when they failed to create a record sufficient to allow appellate review of the judge's improper curtailment of Terry's right to adequately *voir dire* the jury.

The Sixth and Fourteenth Amendments of the United States Constitution guarantee a capital defendant the right to a fair trial before a panel of impartial and indifferent jurors. *Morgan v. Illinois*, 504 U.S. 719, 728 (1992); *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988); *Duncan v. Louisiana*, 391 U.S. 145, 147-158 (1968); *Turner v. Louisiana*, 379 U.S. 466, 471-473 (1965); *Irwin v. Dowd,* 366 U.S. 717, 722-723 (1961). In capital cases, this right embraces the concomitant "right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment . . .." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007) (citing *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968). The "essential demands of fairness" require that criminal defendants be given the opportunity to assure themselves of this right through *voir dire* directed to uncovering bias. *Aldridge v. United States*, 283 U.S. 308, 310 (1931) (holding that summarily dismissing defense counsel's request for supplemental *voir dire* on an issue of bias, the trial court violated the defendant's right to due process). *Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion).

The issue of a fair and impartial jury "becomes most grave when the issue is of life or death." *Aldridge*, 283 U.S. at 314. Capital defendants have a greater, not a lesser, right than others to ensure themselves of a fair and impartial jury. *See, e.g., Turner v. Murray,* 476 U.S. 28 (1986) (holding that capital defendants have a constitutional right to explore the issue of racial bias even in the absence of such a right when lesser penalties are at stake).

Terry had the right to question jurors about their willingness to impose a life sentence if he were convicted of capital murder, and to explore any bias they may have harbored which would result in an automatic death penalty sentence. The only way to root out these attitudes is by allowing counsel to question the jurors about them.

> A defendant on trial for his life must be permitted to voir dire to ascertain whether his prospective jurors function under such misconception. The risk that such jurors may have been empaneled in this case and "infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized . . . Petitioner was entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty.

*Morgan* at 735.

Additionally, empirical data, collected and analyzed by the Capital Jury Project, shows that in South Carolina 14% of jurors who have actually served in capital cases believe that the death penalty is the only acceptable punishment for a defendant who has been convicted of murder. John H. Blume, Sheri Lynn Johnson, and A. Brian Threlkeld, *Probing "Life Qualification" Through Expanded Voir Dire*, 29 Hofstra L. Rev. 1209, 1220.

Trial counsel's conduct in attempting to conduct a meaningful *voir dire* was consistent with the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 10.10.2(B) (1993):

> Counsel should be familiar with the precedents relating to questioning and challenging of potential jurors, including the procedures surrounding "death qualification" concerning any potential juror's beliefs about the death penalty. Counsel should be familiar with techniques:
>
> > (1)    for exposing those prospective jurors who would automatically impose the death penalty following a murder conviction or finding that the defendant is death-eligible, regardless of the individual circumstances of the case;

(2)    for uncovering those prospective jurors who are unable to give meaningful consideration to mitigating evidence; and

(3)    for rehabilitating potential jurors whose initial indications of opposition to the death penalty make them possibly excludable.

The trial court judge, by improperly curtailing counsel's ability to ask relevant questions about the jurors' attitudes about the death penalty, ran afoul of established constitutional principles regarding *voir dire*, and trial counsel rendered ineffective assistance of counsel by not vigorously arguing for more expansive *voir dire*.  Counsel must be allowed to ask probing questions of jurors' beliefs:

> As to general questions of fairness and impartiality, such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed. More importantly, however, the belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's ability to follow the law . . . It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so.

*Morgan* at 735.

Trial counsel rendered ineffective assistance of counsel by failing to conduct an adequate *voir dire*, or creating a record sufficient to preserve the issue for appellate review.  Also, post-conviction counsel rendered ineffective assistance of counsel for failing to raise this issue during Terry's collateral state proceedings, and neither attempted to interview witnesses or research the abundant case law that exists on this issue.

For example, the Supreme Court of Ohio, in *State v. Jackson*, N.E.2d 1173, 107 Ohio St.3d 53 (2005), found that the trial court judge abused his discretion by not allowing counsel to inform potential jurors that one of the murder victims was a 3-year-old child.  The judge prevented counsel from questioning jurors about the specific facts of the case because he perceived these sorts of

questions as an attempt to "predispose jurors to react a certain way to anticipated evidence." In vacating the death sentence, the court held that "[c]ounsel should be permitted to present uncontested facts to the venire directed at revealing prospective jurors' biases." (quoting *Turner v. Murray*, 476 U.S. 28 (1986). Here, in Terry's case, the trial court judge limited counsel's ability to question jurors in any probing manner at all, confining counsel to only general and abstract questioning. Counsel had a duty to challenge the judge's limitations on *voir dire*, and then properly preserve the error for appellate review.

The Supreme Court of California also visited the issue of improper *voir dire* limitation in *People v. Cash*, 28 Cal. 4th 703 (2002). There, counsel was not allowed to question jurors whether they would automatically impose the death penalty for a defendant with two prior murder convictions. Also, the trial court judge would not allow counsel to ask about any specific acts of mitigation or aggravation because it would have the jurors "prejudge the evidence." *Id.* at 719. The court held that such restrictions violated federal and state constitutions to an impartial penalty jury:

> [W]e affirm[] the principle that either party is entitled to ask prospective jurors questions that are **specific enough to determine if those jurors harbor bias**, as to some fact or circumstance shown by the trial evidence, that would cause them not to follow an instruction directing them to determine a penalty after considering aggravating and mitigating evidence.

*Id*. at 720-21 (emphasis added).

As to prejudice, the court held that the defendant could not identify a particular biased juror "but that was because he was denied an adequate *voir dire* about prior murder, a possibly determinative factor for a juror. By absolutely barring any *voir dire* beyond facts alleged on the face of the charging document, the trial court created a risk that a juror would automatically vote to

impose the death penalty on a defendant who had previously committed murder was impaneled and acted on those views, thereby violating defendant's due process right to an impartial jury." *Id.* at 723.

The highest criminal court of Oklahoma, the Court of Criminal Appeals, in *Jones v. State*, 990 P.2d 247 (1999), also found that a capital defendant's right to due process was violated when counsel was not allowed to explore whether jurors would automatically impose the death penalty for a conviction for murder in the first degree. The court held that it was clear from the record that the trial court's questions were not sufficient to discover whether jurors would automatically impose the death penalty, and the questions counsel was allowed to ask were not sufficient to determine this important issue. *Id.* at 250.

The Supreme Court of Louisiana reversed the conviction and sentence for a capital defendant where the judge curtailed defense counsel's examination in the areas of principles of law and rehabilitation of jurors opposed to capital punishment. *State v. Hall*, 616 So.2d 664 (1993). The court found that the trial judge "failed to temper the exercise of his discretion by giving the "wide latitude" to counsel for defendant in his examination of prospective jurors, as required by law. *Id.* at 669. The court found "most objectionable" the restriction on defense counsel's examination on issues of law, such as elements of the offense, reasonable doubt and specific intent. *Id.*

> The trial judge's limitation of the defenses questioning to whether the jurors would accept the law as given is never been favored in our law. Rather, this court has rejected the contention that unjustified restrictions on voir dire can be cured by a response on the part of a prospective juror that he will follow the law as given to him by the judge when the juror is unaware of the complexity of the law and where that law involved such a basic right of the defendant.

*Id.*

In *Skipper v. State*, 257 Ga. 802, 364 S.E.2d 835 (1988), the Supreme Court of Georgia reversed the death sentence for the defendant when counsel was not allowed to further question prospective jurors about their views of the death penalty after they indicated on a questionnaire that they were not conscientiously opposed to capital punishment. The court held that the trial court judge's limitation on *voir dire* deprived the defendant of an opportunity to determine whether prospective jurors were impartial on the question of sentence, despite their answers on the questionnaire. *Id*. at 806.

The Supreme Court of New Jersey addressed the scope of capital *voir dire* in *State v. Williams*, 113 N.J. 393, 550 A.2d 1172 (1988). In this case, defense counsel repeatedly objected to the limited scope of the trial court's questioning, especially with respect to juror's attitudes toward imposition of the death penalty. Counsel objected to the adequacy of the judge's perfunctory questioning regarding attitudes -- both pro and con -- towards the death penalty, their exposure to pretrial publicity, and preconceived opinions concerning the guilt of the defendant. The inadequate questioning left defense counsel insufficiently informed to make an intelligent and effective challenge of potential jurors for cause or peremptorily. The court refused to ask jurors about attitudes of murder committed in conjunction with rape. The court found this a "serious error." *Id*. 417, 1184.

The court held that counsel must be afforded the opportunity for a thorough *voir dire* to evaluate and assess the juror's attitudes in order to effectively participate in jury selection.

> Given the important, delicate, and complex nature of the death qualification process, **there can be no substitute for thorough and searching inquiry** by the trial court into each individual's attitude concerning the death penalty. An important ingredient in this inquiry is the use of open-ended questions, which in our opinion are the most likely to provide counsel and the court with insight into jurors' opinions and biases.

*Id*. at 413, 1182 (emphasis added).

The court further found that the trial court judge relied too heavily on close ended questions. *Id*. 420, 1186. The court noted that probing inquiries are essential in uncovering hidden biases." *Id*. 424, 1188. See *Darbin v. Nourse*, 664 F.2d 1109, 1113 (9th Cir.1981) ("Questions which merely invite an express admission or denial of prejudice are, of course, a necessary part of *voir dire* because they may elicit responses which will allow the parties to challenge jurors for cause. However, such general inquiries often fail to reveal relationships or interests . . . which may cause unconscious or unacknowledged bias. For this reason, a more probing inquiry is usually necessary.")

The Supreme Court of Wyoming addressed the proper scope of *voir dire* in this non-capital case, *Schwenke v. State*, 768 P.2d 1031 (1989). In this case, three jurors who expressed difficulty being impartial were rehabilitated by the judge. Counsel did not object, and so the case was reviewed under the plain error standard, and the appellant did not meet its burden. However the court revealed that it was not comfortable with such a deferential standard of review and stated that the trial court should not escape criticism. The court found the judges leading questions to be problematic:

> It is well known by judges and trial petitioners that such questions function both rhetorically and psychologically to impose the questioner's control over the response. . . . They are a tool of advocacy, not neutrality. They are particularly destructive to the effective communication so crucial to *voir dire* when they are repeated to a series of challenged prospective jurors. At the very least, the panel learns it may avoid airing its partiality by resort to a pat response; at worst, the panel may assume that the trial court in our system of justice expects it to do so.

*Id*. at 1035 (internal citations omitted).

In short, as other states' highest courts have acknowledged, a probing *voir dire* is necessary to ferret out those jurors who, perhaps unconsciously, would always vote to impose the death penalty for a conviction of murder, and in violation of *Morgan*.     Trial counsel had the duty to vigorously advocate for effective *voir dire*, or at least preserve the issue for later appellate review.

It is clear that this issue never appeared on post-conviction counsel's radar—they did not undertake to interview any jurors in this case, even though both counsel, who worked together on another capital case, Thomas Ivey, did interview jurors in that earlier case.  See Exhibit 25. Because they never conducted any interviews, they failed to realize that there were jurors empaneled on Terry's jury who were incapable of considering a life sentence in this case, and in violation of *Morgan*.  As juror Norwood Brown attests to in his affidavit:

> 6.     For the sentencing decision, we made the decision easily and were all in agreement. We did not discuss giving him a life sentence. Based on the fact that he committed a murder plus rape and burglary, there was nothing he could have said or done to make me give him a life sentence. I believe the death penalty is the right punishment for murder if there are also other crimes.

Exhibit 12.

Juror Robin Ritchie was also incapable of considering a life sentence for Terry:

> 6.     At sentencing, the defense lawyers' attempts to evoke sympathy did not work on me, and the evidence regarding his brain injury did not impact me. What I cared about was whether he knew right from wrong, and he did, so in my opinion he did not deserve a life sentence.

Exhibit 13.

Juror Mary C. Harvey, likewise, would never have considered a life verdict for Terry:

> 8.     During deliberations, they never discussed giving Gary Terry a life sentence. She would not have considered a life sentence in a case like this one. She could have given a life sentence on a murder that was committed in the heat of passion, but if the murder is planned, then the person had time to think about it,

and the death penalty is the appropriate punishment. No mitigation evidence would convince her to give a life sentence when the murder is planned in advance.

Exhibit 31, Affidavit of Kathy LaMotte.

Additionally, PCR counsel did not raise the issue during the post-conviction relief hearing, nor did they provide any of the preceding case law to the judge. The complete oversight of this issue rendered post-conviction counsel's performance wholly ineffective under the standard set forth in *Strickland*, especially in light of what habeas counsel uncovered—unqualified jurors on the panel. Under *Martinez*, collateral counsel's substandard performance excuses the procedural default, and this Court should grant relief.

**IV.    Terry's right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution was violated by trial counsel's failure to develop evidence supporting a defense of guilty but mentally ill and failing to adequately investigate and present mitigation evidence during the trial and sentencing when trial counsel failed to present substantial and highly mitigating evidence of Gary Terry's childhood abuse.**

As recounted in his petition, Docket No. 16, Terry argues that trial counsel's conduct was deficient and prejudicial in failing to adequately investigate, failing to present the significant evidence of physical abuse, failing to provide this information to the forensic psychiatrist, which would have allowed for expert testimony concerning the effects of the abuse, and failing to investigate and present evidence that Terry met the standard of guilty but mentally ill.

Terry was prejudiced by his counsels' substandard performance in providing only a rose-colored glimpse into Terry's torturous childhood. The sentencing phase is "the most critical phase of a death penalty case," *Smith v. Mullin*, 379 F.3d 919, 939 (10th Cir. 2004), because "avoiding execution [may be] the best and only realistic result possible," *Florida v. Nixon*, 543 U.S. 175, 191 (2004). The sentencing body's possession of the fullest information possible concerning

the defendant's life and characteristics is, therefore, highly relevant, if not essential, to the selection of the appropriate sentence. *Lockett v. Ohio*, 438 U.S. 586 (1978). If the sentencer fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors that warrant a less severe penalty. *Woodson v. North Carolina,* 428 U.S. 280, 304 (1976). *See*, *e.g.*, *Tokman v. State*, 564 So. 2d 1339, 1342 (Miss. 1990) ("It is critical that mitigating evidence be presented at capital sentencing proceedings").

Trial counsels' failure to present evidence which was contained in the file, and which was highly mitigating, constituted ineffective assistance of counsel. There is no justification for failing to recognize the mitigating character of evidence that was developed by the retained mitigation investigator, and for purposes of the sentencing phase. Counsel apparently just did not do it. And, as reflected in trial counsel, Elizabeth Fullwood's affidavit, they did not offer any strategic reason for not doing it, especially considering that trial counsel's theory of the case was that Terry's "brain was physically abnormal and either caused or substantially contributed to his criminal behavior." Exhibit 1. Counsel conceded that the state's evidence of guilt was overwhelming, and that they hoped to save his life by presenting evidence of his neurological problems. It appears they were unaware of what they had contained within their files, which can only be attributed to extreme sloppiness and/or failure to communicate with other members of the defense team, an impression supported by the affidavit submitted by their other expert, Jan Vogelsang. Exhibit 19.

But also, the failure to provide this same evidence to their expert forensic psychiatrist is wholly unjustifiable. As Dr. Swartz-Watts' (now Dr. Maddox's) affidavit indicates, Exhibit 24, this additional evidence would have led her to reformulate her expert opinion in this case, and she

would have been prepared to testify that Terry was guilty but mentally ill, a diagnosis that would have compelled at least one juror to strike a different balance with respect to the sentence ultimately imposed. Again, as Fullwood indicates, they never even considered a defense of guilty but mentally ill even though they possessed evidence supporting that diagnosis. Counsel's substandard performance resulted in the jury being left with an impression of Terry that was deeply misleading, and completely at odds with the reality of his life. Counsel admits that they did not make any strategic decision to limit the mitigation testimony of Terry's family members or to avoid presenting evidence that he suffered significant abuse as a child. It was counsel's intention to present all of the evidence of that nature; they just failed to do so.

Had they presented that evidence, the jury would have known that Terry's father saw his kids as "workhorses" and that he would not allow them to play. Exhibit 16. They would have known that Terry's mother, Patricia, would try to stop her husband from beating the kids, and then she would be hit. Exhibit 16. The jury would have known that Bill was violent, and threw Terry up against a wall. Exhibit 17. They would have known that Bill kept a strap behind a door, and that sometimes the children could not go to school so the teachers would not see the marks. Exhibit 17. The jury would have known that Bill would tie the kids up to a tree in their front yard, and that he would have them beat each other. Exhibit 18. Bill once held Terry's mother down and made her eat a pack of cigarettes. Exhibit 18.

Patty Terry, Gary's mother, had this to say about Terry's father:

5.      Bill whipped the children with a belt almost daily. Almost daily, he would hit at least one of the children with either a belt or his hand. He would give them 8-10 licks or more, depending on his anger level. Bill was a very strong man. He built the house we live in with his hands. The beatings were very severe. I would have to break up the beatings by getting between Bill and the children, and then Bill would hit me. The children would see Bill hitting me.

11.     Bill used to have the children "fight it out" among themselves. One day, when Gary was between 12-14 years old, he and Johnny were fighting in the garage area. Bill was there, too, but did not stop the fight. Johnny is much bigger and stronger than Gary. Gary picked up a brick and threw it at Johnny. The brick broke the windshield of Bill's car and then Bill hurt Gary. He broke his collarbone, and I think he did so by hitting him with a board that was in the garage. I was at work when this happened. I have tried to remember this event to the best of my ability. It has been a long time ago. Bill had the girls "fight it out" too. I believe that this is part of the reason why the children will not have anything to do with one another.

12.     Bill was very unpredictable. Little things would set him off. We never knew from one minute to the next what would set him off. I remember he got angry because I fixed the children's dinner plates before I fixed his. He was so angry that he threw all the food out of the back door. He also did this when he did not like what I cooked for dinner. His philosophy was that if he couldn't eat, then no one else would. He did not care that the children went without eating supper.

22.     Bill often told me that he would "blow [my] brains out." The children heard him say this to me.

Excerpts from Exhibit 20.

Terry's older sister, Faye Servoss, was also available to tell the jury of the extraordinary

abuse and violence she and her siblings experienced:

2.     My daddy, Bill, beat all of us. He had a leather and canvas piece of conveyor belt that he used. It was 3- 3 ½ inches wide, and he stripped it so that it would have between 5-6 tassels or whips. The handle was taped with black electrical tape. He would use that to beat us. He would make you hold his hand and would ask, "Do you hate me?" while he would beat us. I would wear long-sleeved shirts to school, regardless of the season, to hide the bruises.

3.     After daddy broke his back, my brother Billy would tie me to a tree and he would beat me because daddy told him to do it. I was 13 when this happened.

5.     As children, we were always isolated from other kids. We were not to associate with cousins or other children . . .

15.     I remember when daddy was going to put up some paneling in the house. Momma had ceramic chickens on the wall that she had put up there as decoration. Daddy told me to bust them up with a hammer, and I did so because I had to obey him. Daddy laughed when I did it.

16.     I had to physically fight my sister, Lanie. I remember once when I was in 5th or 6th grade, momma told me that Lanie said something bad about me and that I should "kick her ass." These fights were always in my parent's bedroom, and I feel like we were a sport to them.

35.     I think momma contributed to the violence in the house by antagonizing daddy.

Excerpts from Exhibit 21.

Other family members were also available to testify to the sadistic and cruel beatings of Terry's father. Exhibits 22 and 23.

Indeed, trial counsel seems to have had no clue about any of the evidence relating to abuse that was contained in Ms. Vogelsang's notes, or would have been immediately apparent to them if they had spoken to her about it. The following is a portion of Fullwood's direct examination of Bill Terry during the penalty phase of the trial:

> Q:     Okay. Do you think after the accident (Bill broke his back at work) you were able to be the same type of father that you were before?
>
> A:     Oh, no, not the same type of father, not the same type of husband.
>
> Q:     Could you play with the children like you wanted to or do things with them like you wanted to?
>
> A:     I could play with them, but not like I used to—you know, used to could. I couldn't get, you know, rough with them, you know, playing. I just couldn't do it.
>
> Q:     Okay.

App. 1916-17.

> Q:     Did he like to fish?
>
> A:     Yeah, he loved to fish.
>
> Q:     Did you take him with you?

A:     Yeah, I sure did. He used to catch right on the live bait to fish with.

App. 1920.

Post-conviction counsel did not raise this issue at Terry's post-conviction hearing.  As Fullwood indicates, she never even spoke to PCR counsel during the pendency of this action, even though she would have willingly discussed the case with them.  Exhibit 1. Neither Floyd nor Armstrong interviewed any of the mitigation or medical experts retained by trial counsel, nor did they seek any funding for their own mitigation specialist, social worker, psychiatrist, or mitigation investigator.  They did not attempt to speak to Vivian Massey, Jan Vogelsang, Toni Bovee, Dr. Donna Swartz-Watts, Dr. Robert Deysach, or Dr. David Bachman, all experts still residing in the area. In fact, Dr. Swartz-Watts attests in her affidavit that she knows both Floyd and Armstrong and was working on cases with both of them around the same time as Terry's PCR proceedings. Exhibit 24.

Counsel did, however, receive funding for a forensic entymologist, a DNA expert, a forensic pathologist, and a false confessions expert, evidencing their focus in PCR on challenging Terry's factual guilt of the crime.  They also hired private investigators in an attempt to develop other possible suspects.  Exhibit 25, Affidavit of H. Wayne Floyd, and Exhibit 26, Affidavit of Melissa ("Lisa") Armstrong.  This approach is remarkable given the strength of the state's evidence against Terry, which included fingerprints, DNA, and a confession.  PCR counsel rendered ineffective assistance of counsel by failing to raise this issue, and Terry was prejudiced by their substandard performance.  Collateral counsel's ineffectiveness excuses the procedural default under *Martinez*, and this Court should find that Terry is entitled to relief.

**V.     Terry's right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution was violated by trial**

**counsel's failure to object to aggravation testimony from Terry's ex-wife that he had raped her during their marriage when the State had provided no notice of this alleged incident and counsel failed to impeach this testimony.**

Trial counsel rendered ineffective assistance of counsel when they failed to impeach the highly inflammatory testimony of Tamantha Griffin, Terry's ex-wife, when she testified to a purported rape that occurred during their marriage, and when abundant impeaching material was in the possession of trial counsel. The factual basis for this claim is in Terry's petition for habeas corpus at Docket No. 16.

Counsel's conduct was deficient and prejudicial in failing to object to this evidence due to lack of notice or make any attempt to impeach the witness. Consistent with the claim raised in Issue IV, it appears that trial counsel was unaware of information they had in their possession suggesting a deep lapse in communication between members of the defense team. Knowing that Terry's life would hang in the balance during a penalty phase, and knowing that his ex-wife would be called to testify, it is inexcusable that counsel was not prepared to impeach Tamatha Griffin's claim—raised for the first time at trial—that Terry had raped her. Such a lapse is even more incomprehensible given the nature of the crime involved. Surely counsel realized that Griffin's testimony, which suggests a pattern of sexual assaults by Terry, was horribly prejudicial. Counsel's failure to impeach her, with documents in its possession, defies explanation.

In *Rompilla v. Beard*, 545 U.S. 374 (2005), the Court found trial counsel ineffective when they failed to review a prior conviction file when they knew the Commonwealth intended to seek the death penalty by proving Rompilla had a significant history of felony convictions, knew it would attempt to establish this history by proving Rompilla's prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim's testimony

given in an earlier trial.  The Court noted that "it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation." *Id.* 385.  And also, "[i]t flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking." *Id.* 388. Here, counsel had all of the necessary impeaching material *in their own files*, yet remained utterly silent when Griffin offered her devastating testimony.  The consequence of leaving her statement unchallenged is that it offered a picture of Terry that suggested he was a serial rapist.  Challenging this perception would have led at least one juror to strike a different balance on the issue of penalty. *Wiggins*.

PCR counsel, too, rendered ineffective assistance of counsel by failing to raise this issue in collateral proceedings.  As evidenced by their affidavits, Floyd and Armstrong simply did not engage in any meaningful consideration of the mitigation case presented by trial counsel.  They failed to interview any of trial counsel's mitigation investigators or witnesses, evidencing their lack of concern with this aspect of Terry's capital trial.  Consistent with that oversight, they failed to raise this issue as well.  Trial counsel's performance was ineffective, and this Court should excuse the procedural default due to post-conviction relief counsel's ineffectiveness pursuant to *Martinez*.

## CONCLUSION

Terry has shown, with respect to Ground I of his habeas petition, that the South Carolina Supreme Court's decision was contrary to and involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, as well as an unreasonable determination of the facts, and he is entitled to relief.  With respect to Grounds II-V,

Terry has shown that he is entitled to relief, notwithstanding the procedural default under the *Martinez* decision, because he received woefully inadequate post-conviction relief counsel. Terry respectfully asks this Court to deny the Respondent's Motion for Summary Judgment, and deny Respondent's Motion to Strike Petitioner's Exhibits. Terry is entitled to relief on all grounds or, at minimum, an evidentiary hearing on these issues to resolve the outstanding genuine issues of material fact.

Respectfully submitted,

/s/ Elizabeth Franklin-Best
Fed ID #9969
Blume Franklin-Best & Young, LLC
900 Elmwood Avenue, Suite 200
Columbia, South Carolina 29201
(803) 765-1044
betsy@blumelaw.com

Laura W. Young
Fed ID # 12453
Blume Franklin-Best & Young, LLC
900 Elmwood Avenue, Suite 200
Columbia, South Carolina 29101
(803) 765-1044
laura@blumelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2018, I electronically filed the foregoing with the Court using the ECF system, which sent notification of the filing to counsel for respondent.

/s/Elizabeth Franklin-Best
Counsel for Petitioner